UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSEPH J. GIUDICE,

          Plaintiff,                    **DECISION**

v.                                 **and ORDER**

RED ROBIN INTERNATIONAL, INC.,        11-CV-6099T

          Defendant.
_____

## INTRODUCTION

Plaintiff Joseph Giudice,("Giudice" or "Plaintiff"), brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), (codified at 42 U.S.C. § 2000(e), et seq.) and the New York State Human Rights Law against his former employer Red Robin International, Inc., ("Red Robin" or "Defendant") claiming that he was retaliated against for complaining of discrimination based upon his sex and sexual orientation. Specifically, Plaintiff claims that after he complained to his manager of sexual harassment in the workplace, his employment with Red Robin was terminated.

Defendant denies Plaintiff's allegations and moves for summary judgment dismissing Plaintiff's Complaint on grounds that Plaintiff has failed to state a prima facie case of retaliation. Defendant claims that Giudice cannot establish that he engaged in any protected activity or that any alleged retaliatory conduct by Red Robin was causally connected to Giudice's complaints. For the reasons set forth below, I grant Defendant's motion for summary judgment and dismiss Plaintiff's Complaint in its entirety.

**BACKGROUND**

The following facts are set forth in the Defendants' Statement of Undisputed Material Facts submitted pursuant to Rule 56(a) of the Local Rules of Civil Procedure. See Docket No. 13-8. This Court specifically notes Plaintiff's lack of dispute with the vast majority of the material facts as set forth by the Defendant. See Docket No. 17-1.[1] Of all the material facts cited herein, none were disputed by Plaintiff.

Plaintiff Joseph Giudice was a full-time employee of Red Robin working, most recently, as the Assistant General Manager of the Red Robin location in Webster, New York. Plaintiff, in his Complaint, claims that after he complained to his supervisor about sexual harassment in the workplace, he was retaliated against when Red Robin terminated his employment on July 7, 2010.

Before his termination, Giudice had been employed by Red Robin since November 2005. He started his employment with Red Robin in the Amherst, New York location, and ten months after being hired,

---

[1]Of ninety-three material facts submitted by the Defendant, Plaintiff contests only sixteen. Eleven of those sixteen contested facts concern whether or not Plaintiff had proper training in how to appropriately fill out the Timekeeping Error Logs, which for the case at hand is irrelevant for his retaliation case, since Plaintiff does not attribute this "failure to train" to any discriminatory animus of Defendant or its employees. The outcome of the instant case is not dependent upon whether or not Giudice was trained properly in how to fill out the logs. It is dependent upon whether or not Red Robin retaliated against Giudice for making a complaint to his supervisor.

he was transferred to the Red Robin in Henrietta, New York. In November of 2007, Giudice was promoted to assistant general manager of the Henrietta location. In June 2008, Giudice agreed to transfer to the Webster, New York location, becoming the new assistant general manager of the Webster store.

Throughout his time at Red Robin, Plaintiff worked with, supervised, or was supervised by a number of employees relevant to the instant case. Plaintiff met and worked with Scott Pickett ("Pickett"), when Pickett was hired as a cook in the Henrietta store in 2006. Pickett transferred to the Webster store as an assistant manager weeks prior to Plaintiff transferring to the same location. Plaintiff also met and worked with BJ Cragg ("Cragg"), another assistant manager, while he was working at the Henrietta store. Cragg transferred to the Webster location shortly after Plaintiff transferred there. Upon starting at the Webster location, Plaintiff did not object to continuing to work with Pickett and Cragg. Deposition Transcript of Joseph Giudice at 187-88. Sean Miller ("Miller") was also a Red Robin "Team Member"[2] at the Webster location. In addition to other employees, Miller, Cragg, and Pickett were all supervised by Plaintiff. Christine Flynn ("Flynn") was hired as the General Manager in charge of the Webster location in July 2009. In that position, Flynn was

_____

[2]Red Robin refers to non-managerial employees as "Team Members."

Plaintiff's direct supervisor.   In October 2009, Al Hansen ("Hansen") became the Regional Operations Director over the entire Buffalo region, which includes the Webster location.

As an Assistant General Manager, Plaintiff was a member of the management team and shared responsibility with the General Manager for the total operations of the Red Robin restaurant.   This included all aspects affecting profit and loss, hiring and training of management and hourly team, daily executions related to safety and sanitation, quality food preparation, and guest service. Additionally, an Assistant General Manager shares responsibility with the General Manager  for communicating and administering all company policies and procedures.

 According to the Red Robin "Prohibited Conduct" policy, which was given to Giudice in November 2005 and a revised copy in December 2009, "malicious gossip and/or spreading rumors; engaging in behavior designed to create discord and lack of harmony; threatening, intimidating, or coercing fellow Team Members; and obscene or abusive language toward any Manager, Team  Member, or Guest" were all prohibited in the Red Robin workplace.

Red Robin also maintained a formal Timekeeping and Meal/Rest Breaks Policy. See Exhibit J to Declaration of Julie Rivera, Docket Nos. 13-5.  It stated that "[i]t is illegal and against Company policy to allow or require an hourly Team Member to work, 'off the clock,' or to adjust a [Team Member's] hours unless a mistake has

been made." Red Robin's hourly employees were expected to clock in and clock out at any register, which used an electronic timekeeping system, and managers were permitted to use a form called a Timekeeping Error Log only to correct errors or to arrange for payments outside of the electronic system. For example, managers could use this system if an employee forgot to clock in or when an employee worked outside of the store and could not physically clock in. Time recorded in these logs was sent to the payroll department so that employees could get paid for the hours that they actually worked.

During Plaintiff's employment at Red Robin, Defendant received numerous complaints about Plaintiff's workplace conduct. In March 2008, a few months after Plaintiff's promotion to Assistant General Manager, a complaint to Red Robin was submitted anonymously from "Many [Team Members]" claiming that Plaintiff was "very unprofessional" and that he "often yells and berates [Team Members]...as business picks up." It further complained that Plaintiff engaged in a "huge confrontation" with several guests in the restaurant. As a consequence of the anonymous complaint, Plaintiff was verbally counseled to improve his treatment of Team Members and guests.

Four months later, in July 2008, after Plaintiff's transfer to the Webster location, Red Robin discovered that Plaintiff and the other managers of the Webster Red Robin had been making edits

through the Timekeeping Error Logs to the time that Team Members had worked by inserting breaks that were not taken and adding time to the beginning or end of Team Members' shifts. The managers did this in order to show their store's compliance with the Red Robin Breaks Policy. As a result, on July 31, 2008, Plaintiff, along with the other members of the Webster management team was issued a Final Written Warning for violating the Red Robin Timekeeping Policy. Deposition Transcript of Joseph Giudice at 134, 147; Exhibit C to Declaration of Julie Rivera, Docket No. 13-5; <u>see</u> Exhibit C (Final Written Warning) to Declaration of Al Hansen, Docket No. 13-7. Plaintiff was warned that changing an employee's time was "completely unacceptable," that such actions "put the company at risk," and that Plaintiff must "ensure that all Team Members are paid for every minute they work." Exhibit C (Final Written Warning) to Declaration of Al Hansen, Docket No. 13-7. Plaintiff was further told in the Final Written Warning that his failure to follow these policies would result in additional disciplinary action, "up to and including termination." Exhibit C (Final Written Warning) to Declaration of Al Hansen, Docket No. 13-7.

In October 2008, a Team Member complained that Plaintiff had engaged in inappropriate conversations in the workplace about her. As a result, Plaintiff was issued another written warning and

reminded that such conduct as a manager was "completely unacceptable."

In September 2009, Plaintiff was told in his mid-year evaluation that he needed to "keep his cool under pressure" because when things get stressful, he has "the tendency to get very short with Team Member[s]."  At his end of year evaluation for 2009, Plaintiff was advised to "be more professional" in the workplace.

In November 2009, Hansen met with all of the General Managers in the Buffalo region and again reviewed with them Red Robin's labor reporting procedures, including the Timekeeping Error Log process, how to record hours on those logs, and how to report labor dollars correctly.  Plaintiff attended that meeting at Flynn's request.

In January 2010, another Team Member submitted a complaint about Plaintiff's disrespectful and unprofessional conduct towards two customers.

In March 2010, Flynn reported to Hansen that several Team Members again complained about Plaintiff's inappropriate yelling and berating of them.  As a result, Hansen counseled Plaintiff to improve his conduct.

At the end of March 2010, Miller complained to Hansen that Plaintiff was "ranting and raving" at Team Members.  He also reported that Plaintiff was making customers feel unwelcome. Hansen suggested that Miller contact Julie Rivera ("Rivera"), their

Regional Human Resources Director, to submit a complaint. Miller submitted an email complaint to Rivera indicating that Plaintiff, among other things, "belittles Team Members" and "yells across the restaurant at employees."

Given the number of complaints against Plaintiff, Rivera and Hansen decided to issue Plaintiff a formal disciplinary warning. In early April 2010, Hansen traveled to the Webster location and, together with Flynn, met with Plaintiff and issued him a written warning. The warning reminded Plaintiff that his interpersonal and professional conduct had been addressed multiple times and "in order for [Plaintiff] to continue to be employed as a Manager at Red Robin," his employer needed to see "immediate and sustained improvement." Deposition Transcript of Joseph Giudice at 172-73; see Exhibit K (Interpersonal Communication and Leadership) to Declaration of Al Hansen, Docket No. 13-7. The following day, Plaintiff took a medical leave of absence from April 9 to April 23, 2010.

On May 8, 2010, soon after Plaintiff's return from his medical leave of absence, Flynn began an unexpected medical leave of absence. During Flynn's leave of absence, Plaintiff was temporarily made acting General Manager for the Webster Red Robin, making him the highest-level manager for the location at that time. Plaintiff testified at his deposition that during Flynn's leave of absence, Hansen traveled to the Webster store and assigned

Plaintiff the responsibility for "Profit & Loss Reporting," which included the oversight and reporting of hours entered into the store's time-keeping error logs. Deposition Transcript of Joseph Giudice at 109, 192-93.[3]

During the week of May 24, 2010, Hansen attended a Red Robin menu rollout meeting in Buffalo, New York. While there Miller approached Hansen and asked whether Team Members were to be paid for attending that meeting. Hansen responded affirmatively, but Miller reported to Hansen that Plaintiff informed him that Team

---

[3]In his Response to Defendant's Local Rule 56(a)(1) Statement of Material Facts, Plaintiff claims that this fact and several others are now disputed because he has submitted an affidavit stating that he "had little to no experience or training on how to complete these logs appropriately" or alternatively, that "any experience or training [he] did have regarding these logs was invaluable [sic] as the means and process of completing these logs according to company policy changed multiple times throughout Plaintiff's tenure." See Docket Nos. 17-1; 17-5. Plaintiff uses this exact response to attempt to contest a number of otherwise undisputed facts submitted by the Defendant. I find, however, that Plaintiff's allegation of a lack of training does nothing to contradict the factual averments made by the Defendant in its Statement of Facts, all of which are supported by, and properly cited to, the evidence in the record. Indeed support for many of the facts found in Defendant's Statement of Facts comes directly from Plaintiff's deposition testimony. Accordingly, Plaintiff's new claim of a lack of training in how to properly keep logs does not create a triable issue regarding the majority of the undisputed facts submitted by Defendant. For example, Plaintiff's claim of a lack of training on how to appropriately fill out the Timekeeping Error Logs, whether true or not, does not actually dispute the alleged, and documented fact, that while Flynn was on leave, Plaintiff was in charge of the Timekeeping Error Logs. This is also true for several material facts as cited infra.

Members were not going to be paid for attending the menu rollout meeting. (See footnote 3 supra).

Hansen immediately contacted Plaintiff to inform him that one of Plaintiff's Team Members had concerns about not being paid for his attendance at the meeting and that all employees who had attended the meeting must be paid.

On June 9, 2010, Miller contacted Hansen again complaining that Plaintiff had been yelling and cursing at team members. He also reported that he had still not been paid for his time spent at the menu rollout meeting in Buffalo. The following day, in response to the episode, Hansen called Plaintiff and advised him that he had received a complaint that Plaintiff continued using profanity and being abusive to employees. Hansen also told Plaintiff that Miller was continuing to complain about not being paid for his time in Buffalo and instructed Plaintiff that he had to make sure Miller was paid for his time.

Thereafter, on June 14, 2010, Plaintiff called Hansen to complain that other managers and employees in the restaurant were joking and making comments about his sexual orientation. Upon hearing Plaintiff's complaint, Hansen immediately called Rivera and directed that she investigate the complaint. Rivera called Plaintiff on June 17, 2010, to investigate the complaint. During the conversation, Plaintiff claimed that Pickett had harassed him by making comments about Plaintiff's sexual orientation, by

grabbing Plaintiff and "grinding" on him in late 2009, and by showing Plaintiff a sexual video in March 2010. Plaintiff also alleged that Flynn had asked him an offensive question about his preferred sexual position in the summer of 2009.

Rivera asked Plaintiff if he would be comfortable with a meeting of the entire management team to review the non-harassment policy and to discuss appropriate behavior in the workplace. Hansen was out of the office that week on vacation, so Rivera suggested that they wait until Hansen returned the following week. Plaintiff did not object to this schedule. Rivera also encouraged Plaintiff to call her if any additional harassment occurred.

Shortly thereafter, on June 20, 2010, Red Robin received another complaint, this time from a guest, that Plaintiff had argued with the guest and had been unprofessional. Additionally, Miller renewed his complaint that he still had not been paid for all of the time that he had worked.

On June 22, 2010, Plaintiff called Rivera to report two additional incidents of alleged harassment by Pickett. In this phone call, Plaintiff claimed that he was harassed when Pickett, Plaintiff's subordinate, told him that his cologne "smelled good...no homo" and also when Pickett commented that an unidentified note must have been written by Plaintiff because it looked like a girl's handwriting.

In response, on June 25, Rivera conducted phone interviews of Pickett and Cragg. Rivera confirmed that both Plaintiff and his fellow managers had been joking and making sexual comments in the workplace. The other managers reported that Plaintiff was an active participant in and was often the initiator of these sexual comments and jokes. Additionally, Plaintiff often used profanity, made jokes about sex and sexuality, and made sexual comments about Team Members and Red Robin customers.

Rivera believed that the situation at the Webster store required an in-person visit, so she traveled immediately to New York. Rivera arrived in Webster on Monday June 28, 2010, and met personally with the entire management team, including Flynn, Pickett, and Plaintiff. At this meeting, she reviewed appropriate and inappropriate behaviors in the workplace. Each manager also reviewed the non-discrimination and non-harassment policies, and Rivera and Hansen talked about their expectations going forward. Each manager was also required to take the Red Robin online training for sexual harassment.

After the meeting, Rivera and Plaintiff met privately, and Rivera indicated that she had concluded her investigation of Plaintiff's complaint. Rivera stated that the inappropriate behaviors had been addressed, and going forward, appropriate expectations had been set.

After concluding the investigation into Plaintiff's complaint, Rivera then resumed the investigation into Miller's June timekeeping complaint. Miller identified two instances where Plaintiff had not paid him for work he had performed. Miller said he had not been properly paid for a shift he worked as a line cook and that Plaintiff still had not paid him and another employee for attending the menu rollout meeting in Buffalo. Miller stated to Rivera that when he asked Plaintiff for payment, Plaintiff told him that Hansen would never approve it. Upon hearing this, Rivera reviewed the Timekeeping Error Logs at the Webster store for the prior three months. Rivera confirmed that Miller had not been paid properly and found additional entries recorded in the logs that showed other unusual, random payments to employees.

Rivera sent the Timekeeping Error Logs to Hansen, and they decided to ask Plaintiff whether he could explain the payments and Miller's continued complaints. They met with Plaintiff on July 6, 2010 to discuss these issues. Rivera and Hansen asked Plaintiff whether he had paid Miller and the other Team Member for attending the meeting in Buffalo, and Plaintiff responded that he could not remember or did not know whether they had been fully paid. Deposition Transcript of Joseph Giudice at 244-46, 252-54, 257; Deposition Transcript of Julie Rivera at 171-72, 175. (See footnote 3 supra). Similarly, when Rivera and Hansen asked Plaintiff whether Miller had been paid for the time that he worked

as a line cook, Plaintiff responded that he was so busy that he may have overlooked it. Deposition Transcript of Joseph Giudice at 254; Deposition Transcript of Julie Rivera at 183. (See footnote 3 supra). At the meeting, Plaintiff tried to provide explanations for the other random entries on the Timekeeping Error Logs.

After the meeting on July 6, 2010, Plaintiff's employment was suspended pending a final decision. Upon further review, Rivera confirmed that Plaintiff's explanations for some of the random payments on the Timekeeping Error Logs were not true. Later that same day, Rivera, Hansen, and Flynn's replacement met and reviewed Plaintiff's record, the complaints about his behavior, his numerous violations of Red Robin policy, his responses to their questions about timekeeping, and his 2008 Final Warning. Those present at the meeting decided to terminate Plaintiff's employment with Red Robin effective the next day, July 7, 2010.

At all times during his employment with Red Robin, Plaintiff was open with his co-workers and fellow managers about the fact that he was homosexual. Deposition Transcript of Joseph Giudice at 40, 96. Plaintiff was also friendly with and socialized with his fellow managers-including Flynn, Cragg, and Pickett-both during and after work. Deposition Transcript of Joseph Giudice at 120-21.

Plaintiff testified in his deposition that he "engaged in inappropriate behaviors of a sexual nature through jokes, innuendos, teasing, and touching" while at work. Deposition

Transcript of Joseph Giudice at 262. He also testified that he joked in the workplace about sexuality and that he laughed at such jokes. Deposition Transcript of Joseph Giudice at 260-61. Plaintiff admitted that he called other employees, including Pickett and Miller, "fags" while at work. Deposition Transcript of Joseph Giudice at 61-62, 68, 81, 125. Additionally, Plaintiff testified that he used the word "fuck" at the workplace in a sexual connotation, including the phrase, in reference to male Red Robin customers, a "Dad I'd Like to Fuck." Deposition Transcript of Joseph Giudice at 71-72, 83-84.

Plaintiff testified at his deposition that he read, reviewed and was familiar with the Red Robin timekeeping policies, and understood that it was his responsibility to enforce and follow these policies. Deposition Transcript of Joseph Giudice at 135-37, 139-40, 144-47, 153. (See footnote 3 supra). Furthermore, Plaintiff testified at his deposition that the importance of accurate record keeping of the hours employees worked was "certainly brought to his attention in July of 2008." Deposition Transcript of Joseph Giudice at 135-36. Indeed, between July 2008 and March 2011, Red Robin terminated at least twelve other managers for violations of the Timekeeping Policy. Nine of those terminations occurred prior to or contemporaneously with Plaintiff's termination. At least one of the managers, like

Plaintiff, had promised to adjust an employee's time on the restaurant's Timekeeping Error Log, but never did so.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on July 15, 2010. On January 10, 2011, after investigating the complaint, the Commission dismissed the charge and issued Plaintiff a right to sue. Plaintiff filed the instant Complaint on February 28, 2011.

## DISCUSSION

I.   Defendant's Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. Scott v. Harris, 550 U.S. 372, 380 (2007). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. Scott, 550 U.S. at 380 (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)).

II.  <u>Plaintiff has failed to establish a Prima Facie Case of Retaliation</u>

Plaintiff claims that he was unlawfully retaliated against due to complaints he made to his supervisor about "sexual harassment" in the workplace.

Because I find that Plaintiff has failed to state a claim for retaliation, I grant Defendant's motion for summary judgment, and dismiss Plaintiff's Complaint with prejudice.

To state a claim for unlawful retaliation, a plaintiff must establish: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff or action that would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection between the protected activity and adverse action.  <u>Burlington Northern & Santa Fe Railway Co. V. White</u>, 548 U.S. 53, 68 (2006); <u>Holt v. KMI-Continental</u>, 95 F.3d 123, 130 (2d Cir. 1996), <u>cert</u>. <u>denied</u>, 1997 WL 71191 (May 19, 1997); <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1308 (2nd Cir. 1995) (citations omitted).  Should the plaintiff state a claim for retaliation, the defendant may then articulate a non-discriminatory, legitimate reason for taking the action complained of, and should the defendant do so, the burden then shifts back to the plaintiff to show that the employer's articulated reason is both untrue and a pretext for the true discriminatory motive. <u>Id</u>.

A.  <u>Plaintiff has failed to allege that he engaged in a
    protected activity under Title VII.</u>

Title VII prohibits retaliation by an employer against an employee in cases where the employee has engaged in protected activity under the statute.  "Protected activity" includes opposing employment practices that are prohibited under Title VII (such as discrimination based on race, color, religion, sex, or national origin), or making a charge of discrimination, or participating in any investigation, proceeding, or hearing arising under Title VII. 42 U.S.C. 2000e-3(a). <u>See</u> <u>also</u>, <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 566 (2nd Cir., 2000)("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.")  Specifically, Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. 2000e-3(a).

In the instant case, Plaintiff has failed to establish that he engaged in a protected activity under Title VII.  Because sexual orientation is not protected under Title VII, Plaintiff cannot bring a retaliation case based solely upon a complaint to his supervisor that he was discriminated against because of his sexual

orientation.  In order to be "protected activity," his complaint must have been predicated upon a protected characteristic under Title VII.  Plaintiff claims that he complained about being subject to a hostile work environment based upon his sex and sexual orientation.  At no point in time, however, did Giudice complain about any discrimination associated with his gender.  His only basis under Title VII is a complaint to his supervisor in which he alleged "sexual harassment."

Although a plaintiff need not explicitly allege a violation of Title VII in making a complaint about working conditions to be considered protected activity, (See Kelley, 520 F.Supp.2d at 403 (employee not required to use "legal terms or buzzwords" when complaining of discrimination)) the plaintiff must complain of discrimination in sufficiently specific terms to put the employer on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected by Title VII. International Healthcare Exchange, Inc., 470 F.Supp.2d at 357. Participation in a protected activity occurs only where the plaintiff has a "good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." Kessler v. Westchester County Dep't of Social Services, 461 F.3d 199, 210 (2d Cir. 2006) (quoting McMenemy v. City of Rochester, 241 F.3d 279 (2d Cir. 2001)).

As a matter of law, a reasonable, objective belief that an employee is complaining of sex discrimination cannot arise simply because the behavior in question touches on the issue of sex. Oncale v. Sundowner Offshore Services, 523 U.S. 75 (1998); see also Dottolo v. Byrne Dairy, Inc., 2010 WL 2560551 (N.D.N.Y., June 22, 2010)(where the court found that the plaintiff could not have had a good-faith and objectively reasonable belief that he had been harassed where he had been subject to a single incident with sexual overtones).

Here, Giudice claims that he complained of being sexually harassed, however Giudice's complaint to his supervisor alone does not constitute protected activity. At no time did Giudice allege that he was being treated differently because he was a man, or that any employees of Red Robin treated him or other men differently because of their gender. Under an objective standard, Giudice could not have had a good-faith, objectively reasonable belief that he was opposing discrimination based upon his sex by complaining about isolated incidents that had sexual undertones. Abeln v. Ultra Life Batteries, 2009 U.S. Dist. LEXIS 27126 (W.D.N.Y., Mar. 30, 2009)(Larimer, J.)(no protected activity where plaintiff reported that her supervisor made a vulgar comment; "[f]ederal courts are not designed to be arbiters of good taste.").

Absent a claim of unlawful discrimination, general complaints about employment concerns do not constitute protected activity

under Title VII.  <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 108 (2d Cir. 2011); <u>see</u>  <u>Broderick v. Donaldson</u>, 437 F.3d 1226, 1232 (D.C.Cir., 2006)(employee complaint that she suffered from embarrassing, humiliating and insulting treatment failed to establish that she engaged in protected activity where there was no allegation that the treatment was motivated by a discriminatory animus).  <u>See</u> <u>also</u>, <u>Ochei v. Coler/Goldwater Memorial Hosp.</u>, 450 F.Supp.2d 275, 287 (plaintiff's general complaints about her working conditions did not constitute engaging in a protected activity where plaintiff did not allege that she was a victim of discrimination); <u>McMillan v. Powell</u>, 526 F.Supp.2d 51, 55 (D.D.C., 2007)(employee's complaints regarding supervisor's negative attitude towards her was not protected activity where the complaints failed to allege that discrimination was the basis for supervisor's attitude); <u>International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC</u>, 470 F.Supp.2d 345, 357 (S.D.N.Y., 2007)(to be considered protected activity, the employee's complaint must put the employer on notice that discrimination prohibited by Title VII is occurring);  <u>Holt v. Roadway Package Systems, Inc.</u>, 506 F.Supp.2d 194, 206 (W.D.N.Y., 2007)(Larimer, J.)(employee's claim that supervisor was "out to get him" did not constitute protected activity as complaint did not allege discriminatory animus for supervisor's actions).

Even if Plaintiff's "sexual harassment" complaint were to be construed as "protected," I find that no reasonable jury would find that Plaintiff made his complaint in good faith. Where an employee has admitted that he participated in the alleged "harassing" conduct, and did not find that alleged behavior "unwelcome," no reasonable juror could conclude that he had an objectively reasonable and good faith belief that the same conduct constituted sexual harassment. See Kamrowski v. Morrison Mgmt. Specialist, 2010 U.S. Dist LEXIS 103290 (S.D.N.Y. Sept. 29, 2010)(dismissing retaliation claim where plaintiff could not show she had objectively reasonable belief that Title VII had been violated); Abeln, 2009 U.S. Dist. LEXIS 27126; Neishols v. City of New York, 2003 U.S. Dist. LEXIS 19554 (S.D.N.Y. Oct. 31, 2003).

Here, Giudice does not dispute that he had read and understood Red Robin's anti-harassment policy. Despite his knowledge of the Red Robin policy, Plaintiff admits that he engaged in inappropriate behaviors of a sexual nature while at work. This included jokes, innuendos, teasing, and touching. Plaintiff was an active participant in and often the initiator of these jokes. He often used profanity, made jokes about sex and sexuality, referred to employees that he was supervising as "fags," and made sexual comments about Team Members and Red Robin customers.

Plaintiff now submits in an affidavit excusing his own inappropriate conduct by stating that he has learned that "poking

fun at his own sexuality" was an effective "defense mechanism."[4]
This assertion flatly contradicts Plaintiff's deposition testimony,
and therefore, will be disregarded.  "A party may not create an
issue of fact by submitting an affidavit in opposition to a summary
judgment motion that, by omission or addition, contradicts the

---

[4]This Court notes that in the same affidavit Plaintiff
submits that he complained of harassment before June 2010.  He
claims to have complained to Hansen in May 2010 about the sexual
harassment, to his then General Manager in September of 2009
about comments made by a former manager, to another former
General Manager in the summer of 2009 about harassment, and to a
District Manager in the summer of 2009 about comments made by a
former manager. Affidavit of Joseph Giudice, Docket No. 17-5.
All of these incidents contradict Plaintiff's prior testimony.
See Deposition Transcript of Joseph Giudice at 44-50, 208-09,
211-13, 215-17, 221.  Additionally, Red Robin's employment
records show the timing of most of these "complaints" to be
impossible. See Supplemental Declaration of Julie Rivera, Docket
No. 20-1.  The employees that Plaintiff claims to have complained
to were either not employed by Red Robin at the time that
Plaintiff claims to have complained to them, or were not working
with Giudice at the time. Id. at ¶¶ 4-9. Rather, at his
deposition, Plaintiff testified of similar incidents occurring at
a different store as far back as 2006, but these complaints had
little to do with "sexual harassment." In these alleged
complaints, Plaintiff told his supervisor of isolated incidents
in 2006 about a Red Robin employee's alleged use of alcohol in
the workplace and some comments that employee made that Giudice
deemed as inappropriate or made him feel uncomfortable.
Deposition Transcript of Joseph Giudice at 44-50.  Because the
new complaints in the affidavit directly contradict Plaintiff's
previous testimony, all of these complaints will be disregarded.
This Court, however, takes note of the issue that if these new
complaints were admitted, Plaintiff's forthcoming "temporal
proximity" argument for why his termination should be seen as
retaliation would be nullified.  If these new sexual harassment
complaints actually happened, as Plaintiff submits-in a sworn
affidavit-the time between his complaints and his firing would be
much longer than 23 days.  It would be long outside of the
framework for temporal proximity as stated by the Court of
Appeals for the Second Circuit. See, e.g., Hollander v. American
Cyanamid Co., 895 F.2d 80 (2d Cir. 1990).

affiant's previous deposition testimony." <u>Hayes v. New York City Dep't of Corrections</u>, 84 F.3d 614, 619 (2d Cir. 1996); <u>see also Reynolds v. Sealift, Inc.</u>, 311 Fed.App'x. 422, 425 (2d Cir. 2009). None of the inappropriate behaviors that Giudice engaged in poked fun at his own sexuality. He consistently directed profanity of a sexual nature and vulgar sexual comments at others, including both Red Robin customers and employees he supervised.

Additionally, Title VII is not in place to enable employees "to escape appropriate disciplinary measures," and a plaintiff who makes a complaint "as a means of avoiding disciplinary action for [his] own misconduct" will not be protected. <u>Spadola v. N.Y. City Transit Auth.</u>, 242 F.Supp.2d 284, 292 (S.D.N.Y. 2003); <u>see Middleton v. Metro. College</u>, 545 F.Supp.2d 369 (S.D.N.Y. 2008)(finding that plaintiff did not engage in a protected activity by complaining of sexual harassment where plaintiff did not have a reasonable belief that the coworker's statements were an unwanted sexual advance, and she only asserted sexual harassment after she learned that the Human Resources director was investigating her behavior).

It is uncontroverted that Plaintiff had been disciplined numerous times during his employment with Red Robin. In July 2008, he was given a Final Written Warning for violating the Red Robin Timekeeping Policy. The Final Warning specifically stated that he could be terminated if he again failed to follow the policy. In

April 2010, Giudice was again issued a formal disciplinary warning for his continued problems with interpersonal and professional conduct in the workplace. The warning stated specifically that "in order for [Plaintiff] to continue to be employed as a Manager at Red Robin," Red Robin needed to see "immediate and sustained improvement." Giudice did not complain of any sexual harassment at this meeting.

Just one month after receiving the April 2010 final warning, Plaintiff was instructed by his superior to make sure to pay employees for their time worked at a meeting outside of the restaurant. Plaintiff failed to do so. Additionally, on June 10, Plaintiff was informed that a Team Member made a complaint that Plaintiff continued to yell and curse at Team Members. Both of these instances demonstrate direct failures to comply with the final explicit warnings given to Giudice. However, just four days later, Plaintiff complained of "sexual harassment."[5] I find that this complaint was calculated to avoid further discipline, and therefore was not made in good faith.

Because Plaintiff has failed to establish that he engaged in any protected activity with respect to his employment complaints,

---

[5] Although Plaintiff claims that he made earlier complaints of harassment, for the reasons stated supra at footnote four, none of Plaintiff's claims establishes a material issue of disputed fact.

Plaintiff has failed to establish a _prima facie_ case of retaliation for any alleged retaliatory actions.

>   B.   Plaintiff has failed to establish a causal connection between his alleged protected activity and his termination.

Plaintiff claims that the short time period of time between his making a complaint of sexual harassment and his termination is sufficient in itself to establish a causal connection between the two events as required to state a _prima facie_ case.  I disagree.  Although the timing is admittedly close, I find that Plaintiff cannot show a causal connection between his June 14th complaint and his termination.

For purposes of a _prima facie_ case, there can be no inference of causation where, as here, Red Robin has a history of disciplinary actions against Plaintiff, before he engaged in the "protected activity." Flint v. Tucker Printers, Inc., 2011 U.S. Dist. LEXIS 1645 at *21 (W.D.N.Y. Jan. 7, 2011)(Telesca, J.); Bernard v. J.P. Morgan Chase Bank N.A., 2010 U.S. Dist LEXIS 10195 (S.D.N.Y. Feb. 5, 2010); Deebs v. Alstom Transp., Inc., 346 F.App'x 654 (2d Cir. 2009).  The Court of Appeals for the Second Circuit has confirmed that "where 'timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation [based on timing] does not arise.'" Bernard, 2010 U.S. Dist LEXIS 10195 at *48.  The Court continues, "otherwise, an

employer who institutes progressive discipline would never be free of a claim of retaliation, so long as the employee complained about unfairness." Id at *49.

In Flint, this Court found that even though the plaintiff was terminated just days after the investigation of his complaint for harassment was closed, the undisputed evidence showed that his termination was based on his poor work performance and use of profanity, which had been the subject of several counseling efforts for months prior to his complaint. Accordingly, this Court found that the plaintiff could not demonstrate that his complaint caused his termination.

Here, like the plaintiff in Flint, Giudice cannot show a causal connection between his complaint and his termination. Giudice was warned multiple times about his behavior in the workplace. He was issued final warnings that warned of termination on a number of occasions. Notwithstanding, there were still multiple complaints about Giudice after these warnings. Accordingly, because Red Robin issued Plaintiff numerous warnings prior to his June 14, 2010 harassment complaint, I find Plaintiff's sole reliance on the time between his complaint and his termination is insufficient, as a matter of law, to establish a prima facie case of retaliation.

Accordingly, because Plaintiff has failed to establish that he engaged in any protected activity with respect to his employment

complaints and because Plaintiff has failed to show any causal connection between engaging in a protected activity and suffering an adverse employment action, I find that Plaintiff has failed to establish a <u>prima</u> <u>facie</u> case of retaliation.

III. <u>State Law Claims</u>

Claims brought under the New York Human Rights Law are analytically identical to claims brought under Title VII. <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708 (2nd Cir. 1996). <u>See</u> <u>Haywood v. Heritage Christian Home, Inc.</u>, 977 F.Supp. 611, 613 (W.D.N.Y. 1997)(Larimer, C.J.)(Noting that both claims are governed by <u>McDonnell Douglas</u> standard.). Accordingly, for the reasons stated above, I hereby grant Defendant's motion to dismiss Plaintiff's state law retaliatory discrimination claims under the New York Human Rights Law.

**CONCLUSION**

For the reasons set forth above, I grant Defendant's motion for summary judgment and dismiss Plaintiff's Complaint in its entirety with prejudice.


ALL OF THE ABOVE IS SO ORDERED.

S/ Michael A. Telesca
_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    February 27, 2013
          Rochester, New York